W. L. RICHARDS and Robert L. Wilcox, Respondents, v. NORTH-ERN PACIFIC RAILWAY COMPANY, Appellant.

(173 N. W. 778.)

**Damages — trial — findings of trial court presumed to be correct.**

1. Where the trial court has made findings in a law case properly triable

NOTE.—Authorities passing on the question of liability of carrier for injury to live stock by weather conditions are collated in a note in 34 L.R.A. (N.S.) 1013, where it is held that where weather to which stock is exposed because of negligent delay on the part of the carrier is not so unusual as not to be reasonably expected at that season, it will not be excused from liability on that ground, as such weather conditions are not the act of God in the legal sense of the term. Neither will the

to a jury, it is well settled that the supreme court, upon appeal, will presume that such findings are correct, especially where there is a sharp conflict in the parol evidence received, unless clearly opposed to the preponderance of the evidence.

**Damages — loss occasioned by delay in transportation — liability of carrier.**

2. In an action for damages sustained by negligent delay in the transportation of a train load of cattle by a carrier in an interstate shipment from Vineyard, Texas, to Dickinson, North Dakota, where the connecting carrier received the same at Oakes, North Dakota, for delivery at a station near Dickinson, and, by its negligent delay at Dickinson when the cattle were in a weakened, hungry, and almost dying condition, so delivered the train load at the destination that thereby through existing weather conditions within twenty-four hours, a loss of over 100 cattle was occasioned, it is *held* that the findings of the trial court determining that the defendant was negligent in the delay occasioned and that such negligence was the proximate cause of the loss sustained are justified upon the record.

**Damages — connecting carrier subject to Carmack Amendment.**

3. In such action, the connecting carrier transporting an interstate shipment subject to the Carmack Amendment is liable for its negligent delay occasioning loss through a rainstorm contributing thereto upon the unloading of the cattle at the destination, where it is shown in the record that the carrier, having knowledge of the condition of the cattle and the probable weather conditions, could reasonably have anticipated such loss as the probable result of its negligent delay.

Opinion filed July 3, 1919.

Action for damages against a carrier for loss of cattle. From a judgment of the District Court of Stark County, *Crawford,* J., in favor of the plaintiffs, the defendant has appealed.

Affirmed.

*Watson, Young, & Conmy, Charles Donnelly,* and *D. R. Frost,* for appellant.

carrier be relieved from liability if, by proper care, the effects of the severe weather could have been avoided.

On duty of carrier where act of God has occurred or is threatened, see notes in 29 L.R.A.(N.S.) 671, and L.R.A.1916D, 981.

For prior delay or deviation as affecting carrier's liability for loss of or damage to goods from act of God, see note in L.R.A.1916D, 988.

On the general question of liability of carrier for loss of or injury to live stock, see comprehensive note in 130 Am. St. Rep. 432.

There must be some certainty to the proof of damage. Surmise and speculation will not do. Sutherland, Damages, 4th ed. § 53; 17 C. J. 755, 758, on damages; Evans v. Cumberland Teleph. & Teleg. Co. 135 Ky. 66, 121 S. W. 959. See also Western U. Teleg. Co. v. Totten (C. C. A. 8th C.) 141 Fed. 533; Hightower v. Henry (Miss.) 37 So. 745; Macon v. Dannenberg (Ga.) 39 S. E. 446.

*Thomas H. Pugh* and *T. F. Murtha,* for respondents.

Defendant contends that when tested by Federal decisions, there is a complete failure to prove defendant liable. M. K. & T. R. Co. v. Ward, 244 U. S. 383; Southern P. R. Co. v. Prescott, 240 U. S. 632.

"As the shipment was interstate, and the bill of lading was issued pursuant to the Federal act, the question whether the contract thus set forth had been discharged was necessarily a Federal question." Adams Exp. Co. v. Croninger, 226 U. S. 491, 506, 509, 510; M. K. & T. R. Co. v. Harriman, 227 U. S. 657, 672; Boston & M. R. Co. v. Hooker, 233 U. S. 97; M. K. & T. R. Co. v. Harris, 234 U. S. 412, 420; Charleston & C. R. Co. v. Varnville Furniture Co. 237 U. S. 597, 603; C. C. C. & St. L. R. Co. v. Dettlebach, 239 U. S. 588; N. Y., P. & N. R. R. Co. v. Peninsula Exchange, 240 U. S. 34; Kansas Southern R. Co. v. Carl, 227 U. S. 639.

"The initial carrier under that provision of the Interstate Commerce Act, as an interstate carrier, holding itself out to receive shipments from a point upon its own line in one state to a point in another state, upon the line of a succeeding and connecting carrier, came under liability not only for its own default, but also for loss or damage upon the line of a connecting carrier in the route." Atlantic Coast Line v. Riverside Mills, 219 U. S. 186; Chicago & A. R. Co. v. Kirby, 225 U. S. 155; Central Trust Co. v. Clark (C. C. A. 8th C.) 92 Fed. 293; Copenhaver, etc. Mill. Co. v. Kanawha, etc. R. Co. (W. Va.) 93 S. E. 940.

In the absence of proof *aliunde* of knowledge, by the defaulting party at the time the contract is made, of special circumstances which make other damages the natural and probable effect of a breach, such damages only as are implied by the contract itself, such as would naturally flow from its breach in the usual course of things, such as would reasonably be anticipated by the parties to such contracts in the

great multitude of such cases, and such damages only, may be re-covered. Drug Co. v. Byrd, 92 Fed. 290; Railroad Co. v. Bucki, 16 C. C. A. 46, 30 U. S. App. 460, 68 Fed. 868; Hadley v. Baxendale, 9 Exch. 354; Primrose v. Telegraph Co. 154 U. S. 1, 29, 14 Sup. Ct. Rep. 1098; The Ceres, 19 C. C. A. 243, 72 Fed. 943; Boyd v. Brown, 17 Pick. 461; Ingledew v. Railroad, 7 Gray, 91; Railway Co. v. Mudford (Ark.) 3 S. W. 816; Kempner v. Cohn, 47 Ark. 527, 1 S. W. 869."

The facts in this case are not in dispute, and we think the court is able upon this record to say that the injury is the remote, and not the proximate, result of the defendant's acts, and therefore it would have been proper for the trial court to so direct the jury. Stone v. Boston & A. R. Co. 171 Mass. 536, 41 L.R.A. 794, 51 N. E. 1; St. Louis Cattle Co. v. Ghilson (Tex. Civ. App.) 30 S. W. 270; S. S. Pass R. Co. v. Trich, 117 Pa. 390, 11 Atl. 628, and citations; Brandon v. Mfg. Co. 51 Tex. 121.

BRONSON, J. This is an action for damages sustained in the ship-ment of cattle through the alleged negligence of the defendant car-rier. The action was tried to the court without a jury, and from a judgment entered, upon findings made in favor of the plaintiff, the defendant has appealed. The facts are as follows:

On June 6, 1914, the plaintiff shipped from Vineyard, Texas, con-signed to Dickinson, North Dakota, a distance of 1,470 miles, 998 so-termed stocker or dogie cattle in twenty cars. The original con-tract of shipment was made with the Chicago, Rock Island, & Gulf Railway and constituted a solid train load. Prior to the departure of the cattle from Vineyard they were dipped in a standard arsenical solution to rid them of ticks and lice. This train load proceeded from Vineyard to Addington, Oklahoma, where the first stop was made, and the cattle there again dipped with the arsenical solution. Thence they proceeded to Herrington, Kansas. There the cattle were fed and rested for a half day. Then they proceeded to Omaha, where they were again unloaded and fed and rested for twelve to sixteen hours. Thence the train load was taken by the Northwestern Railroad from Omaha or Council Bluffs to Oakes, North Dakota. They arrived at Oakes on June 11, 1914, at 11:05 A. M. There they were unloaded and put into

pens, which the evidence discloses were quite muddy and filthy, and there they received, in accordance with some of the testimony, both insufficient food and water. There is testimony in the record that prior to the shipment the party in charge cut out of the herd some four or five of the cattle deemed not strong enough to make the journey. These cattle were mostly steers, some heifers among them, grass-raised in Texas, from one year to two years old, and weighed around 500 pounds. The testimony as to their condition ranges from statements that they were the poorest and weakest bunch of cattle ever seen shipped, to testimony that they were in good, fair condition for cattle of that class. At Addington one died. At Herrington, Kansas, there were seven cattle dead upon arrival. At Omaha seven cattle died in the stockyards. At Oakes, North Dakota, some sixteen cattle died or were dead upon their arrival. The train load was rebilled at Oakes over the defendant railway to Dickinson, North Dakota, and proceeded from Oakes at 4:10 P. M. on June 12, 1914. The train arrived at Dickinson June 13, 1914, at 7:20 A. M. The defendant railway company maintains an unloading station for cattle and some grass land for their use at a small station, where there is no agent, called Eland, some 4 miles from Dickinson. For several days prior to the arrival of the cattle at Dickinson the defendant knew that they were coming. On the day before their arrival at Dickinson, there is evidence in the record that one of the plaintiffs advised the defendant's representative that they desired the cattle to be unloaded at Eland; that they could not unload them at Dickinson by reason of no facilities there existing to take care of the cattle; that no objection was made to so doing and the plaintiffs expected such train load to be taken on to Eland. It appears, however, that when they arrived at Dickinson the plaintiffs were advised that they were billed to Dickinson; that no arrangement had been made to take the train load immediately out to Eland; that the same could not be pulled out by a switch engine because contrary to the rules of the company; that it would take some two hours to steam up engines; that it would be necessary to rebill the train load in order to have them shipped to Eland. At this time the cattle were in a weak and hungry condition. One of the plaintiffs testifies that he looked over the cars and saw two cattle down flat and two or three down with their heads up; that he advised the defendant for their

immediate removal as minutes meant money to him. At this time it was cloudy and looked like rain,—a cold, chilly morning. Finally after about three hours the train was taken to Eland, where the plaintiffs were prepared to take care of the cattle. There they proceeded at once to unload the cattle. It was necessary for them to haul out six or seven that were down, dying, or dead. Either 955 or 965 cattle were there unloaded. Immediately they were put out to grass upon the land of the defendant, adjacent. Then, as one of the plaintiffs testifies, it commenced to rain, and it rained hard that day and night. The government weather bureau man at the station about 1½ miles from there testified that the records showed that it began to rain about 1 P. M. and ended around 7 P. M., that the highest temperature that day was 65° and the lowest 49°, that the rainfall was 1.91 inches. Some of the cattle died that day. The next morning one of the plaintiffs counted 102 to 106 dead on the flat; many were drowned in the river adjacent.

This action was instituted to recover damages for the loss of 100 cattle by reason of the negligent delay occasioned at Dickinson and the failure to promptly deliver the train load at Eland. There is evidence in the record by cattle men of experience that, if the train load had been delivered at Eland some two and one half or three hours earlier, the cattle would have had an opportunity to fill up with grass and to recuperate so as to have avoided loss of the cattle for which damages are claimed.

The defendant assigned some twenty-five errors of law in the action of the trial court. These specifications concern principally the contention that the shipment in question must be governed by the Carmack Amendment and the Federal decisions applicable to interstate shipments; that no negligence of the defendant has been shown, and, even if shown, that it was not the proximate cause of the loss sustained, under the Federal decisions and other cases holding that losses sustained through act of God with concurrent acts of negligent delay give no right to recovery. That, furthermore, the delay in the Dickinson yards was not the proximate cause of the loss sustained, the real loss, in fact, being occasioned by the character of the cattle shipped, the condition in which they became during the shipment, and the man-

ner in which they were treated at the Oakes stockyard, which was not subject to or under the control of the defendant.

The record is somewhat long, and there are direct and sharp conflicts in the testimony.

Under the well-settled rule in this state, where the trial court has made findings of fact in a law case properly triable to the jury, this court will not try the case *de novo,* and it will be presumed that the findings are correct, especially where there is a sharp conflict in the parol evidence received, unless clearly the findings are opposed to the preponderance of the evidence. State Bank v. Maier, 34 N. D. 259, 158 N. W. 346, and cases cited therein; Stavens v. National Elevator Co. 36 N. D. 9, 161 N. W. 558.

The trial court has specifically found that the defendant carrier did not have adequate accommodations for the care and feeding of cattle at Dickinson; that it did maintain at Eland, 4 miles from Dickinson, a place for receiving and discharging of cattle and a quarter section of land for such use; that its custom theretofore for many years was to deliver large shipments of cattle at Eland which were usually billed to Dickinson, it being a well-known point, and Eland, a non-agency point; that, furthermore, the defendants knew of the condition of the cattle and the necessity of carrying them on to Eland without delay. That the defendant knew of the conditions existing at Oakes and the manner of treatment which had been accorded to the cattle so received at Oakes; that when the cattle arrived at Dickinson it was necessary that they be placed immediately upon grass in order to save them; that, furthermore, the defendant carrier knew of the impending storm and that the same might arrive in the course of three or four hours. The court further found that 100 head of cattle died directly through the unwarranted and negligent delay of the defendant of holding the cattle at Dickinson for three hours and upwards. The trial court accordingly ordered judgment for the sum of $22.50 for each of the cattle which perished, plus a proportionate amount of the cost of the freight, feed, and transportation. The appellant contends that the trial court improperly determined the new contract made at Oakes between the plaintiffs and the defendant to apply. We do not understand that the trial court so found excepting as a recitation of the facts concerning the things done. In any event we are satisfied upon the

record as pleaded and proved and as found by the trial court that a cause of action is shown for acts of negligence occurring on the defendant's line under the contract of interstate shipment as affected by the Carmack Amendment. 10 C. J. 543.

We are satisfied that there is evidence in the record to justify the findings of the trial court that the defendant negligently delayed the train load at Dickinson upon its arrival there, in view of the knowledge possessed by the defendant of the condition of the cattle and the necessity for their immediate removal as shown by the evidence. Our most serious consideration is addressed to the question of sustaining the damages allowed by the trial court for the 100 head of cattle that perished, and in finding support in the evidence that the defendant's negligence was the proximate cause of the loss as found. In other words, if it be conceded that the defendant carrier was negligent by reason of its delay, and that the cattle, through the resulting condition occasioned by the delay, were unable to withstand the storm which followed, may it not be considered that the defendant's negligence was the proximate cause of the loss?

The appellant contends that the storm was an independent intervening cause. That in applying the Carmack Amendment to the cause of action predicated that line of authorities must be followed which hold that the carrier is not liable for negligent delay in the transportation of property where the subsequent loss occasioned is through the act of God even though, but for such negligence, no loss would have occurred. In this case it is not necessary to pass upon that line of authorities. The principle is founded upon the doctrine that the carrier could not reasonably have anticipated or known that such casualty would occur as a natural result of the delay. 10 C. J. 127. In this case the trial court has specifically found that not only did the defendant know of the condition of the cattle, but it had knowledge of the condition of the weather and the probabilities of a storm. There is evidence in the record to justify such findings. Furthermore, the evidence does not disclose that this was an unprecedented storm or an act of nature that was of unusual occurrence. The prime question, therefore, is whether the acts of the defendant were the proximate cause of the loss. We are satisfied, upon the record and the findings as made, that there is no room for the application of the doctrine that

this was an act of God as an independent intervening factor where a rain storm occurred with a precipitation of 1.91 inches of rain and a drop in the temperature ranging 17 degrees, which the defendant could reasonably anticipate. There is evidence in the record to warrant the findings of the trial court that, if the cattle had been delivered as requested and as it then was its duty to do, the damages claimed would not have been sustained. The damages awarded are sufficiently large. We have entertained considerable doubt whether many of the cattle would not have died even though there had been a prompt delivery at Eland, owing to the weakened condition in which the cattle were at Oakes. However, the record shows that many cattle did die after arrival at Eland (how many the record does not clearly show) for which no claim is based against the defendant, and we therefore conclude that there is justification in the record for the amount of damages awarded.

It is therefore ordered that the judgment be in all things affirmed, with costs to the respondent.

Robinson, J. (dissenting in part). This is an appeal from a negligence judgment for $3,291. The case was tried by the court without a jury, and the judgment is based on findings of fact and conclusions of law.

As it appears, on June 6, 1914, at Vineyard, Texas, the plaintiffs shipped to themselves at Dickinson, North Dakota, some twenty carloads of scrub or dogie cattle,—steers and heifers one and two years old, average weight 300 pounds. The shipping was in twenty cars. On June 12, at Oakes, North Dakota, defendant receives on its cars for shipment to Dickinson all of the surviving animals. They were put on fourteen cars. The cars were shipped with a caretaker, the shippers agreeing to load and unload, feed and water, the stock while in transit, and to furnish for that purpose one or more attendants. The animals were promptly shipped to Dickinson, where they arrived at 7 A. M., June 13th. Then, by reason of some default, they were detained nearly three hours before shipment to the real destination at Eland, a prairie station 4 miles west from Dickinson. About 12 A. M. the poor dogie animals were unloaded, and soon after there set in a severe cold rain storm which continued for eight hours and until the rainfall was nearly 2 inches. The next morning the plaintiffs

counted 100 of the animals dead on the prairie. They claimed that the loss was due to the delay at Dickinson, by which the animals were exposed to the storm before they had time to fill up on the grass. The court found as a fact that on June 12th the plaintiffs gave due notice to the agent and the yardmaster at Dickinson that the cattle should be taken right to Eland, and that by neglect of defendant and its servants the train load of cattle remained on the track in Dickinson from 7 until 10 A. M.; that there was no reason for the delay other than the negligence of defendant, and that if the cattle had been unloaded at Eland two or three hours before the rain storm they could have filled up on the grass so as to withstand the storm, and that in consequence 100 head of the cattle died; that the cattle were worth $22.50 per head, plus $3.40 per head for freight, feed and expense; that the total value of the one hundred head was $2,590, for which judgment was rendered, with costs. In two respects the finding is clearly wrong: (1) The evidence does not show that the delay was the cause of the total loss; (2) the evidence does not show that the dead animals were worth $22.50, or any sum exceeding $5 or $10. Indeed there is no evidence of value only such as may be inferred from the cost price of the whole bunch and the description and condition of the animals, and it is quite preposterous to assume that the dead animals were of the same value as those that lived. All along the road from the point of shipment at Vineyard, Texas, the weakest and poorest of the animals were dying, while the strongest survived. The animals were yearlings or coming two years old steers and heifers, cattle picked up from the tick infested district of Texas. They were known as scrubs or dogies, and their average weight was three hundred pounds. Each animal was infected with a thousand or more ticks which burrowed into its little hide and sapped its life blood. The tick is the great curse of Texas. To rid the animals of ticks they were twice dipped over the head in a strong arsenical solution. One dipping was at Vineyard just as the animals were loaded onto the cars; and the other was at Addington, Oklahoma. At each dipping some of the weaker animals had to be hauled out of the dip or vat and the weaker animals were more or less affected by the poison permeating the hide where it was partly punctured by the ticks, and by the poisonous water which they imbibed when dipped. An expert veterinarian held a post mortem on

one of the animals and he testified: On opening the animals the appearance was of profound anemia (bloodlessness). In the stomach and intestines there was found lacerations of the mucous membrane. There was a lack of fat; there was no kidney fat whatever. The carcass was emaciated. In my opinion the cause of death was chronic arsenical poison. He says: In my judgment the death loss was due to a combination of circumstances. The cattle were too thin, weak, and emaciated before shipment, and the dipping would have more effect on the weaker animals; they would swallow more of the poison dip than the strong ones.

Then such of the cattle as did not get water at Oakes went about three days without water, and they could much better go that length of time without food.

At Oakes the number of cattle loaded was 955. Cattle were dying all along the route. At Oakes sixteen were counted dead and forty were put into a hospital car. The cattle were unloaded at the Northwestern stockyards. However, most of the animals did not get food or water or a place to rest without lying down in 4 or 5 inches of mud. The result of it all was that when the cattle were loaded on the Northern Pacific cars at Oakes they were not in shipping condition, and a large portion of them were in a starving and famished condition, which continued to grow worse and worse until they arrived at Dickinson and Eland. Then 100 of the animals were at the point of death. Their vitality was exhausted and within twenty-four hours they died. There is no sense or reason in claiming that the average value of the dying animals was the same as the surviving; on the contrary, they were practically worthless, and the chances are that most of them would have died even if they had been carried on to Eland without any delay at Dickinson. The 100 animals were at the point of death. They had not strength to stand up and graze, and it is shown that grass does not give any immediate relief to a famished animal. The food must have some time to digest before it can be assimilated and turned into nourishment. The plaintiffs must charge the loss mainly to their own negligence and want of care. They had an attendant in charge of the animals, but there is no showing that he was furnished with any money to buy feed or water, or that he was in any way efficient; and when the weaker animals arrived at Dickinson and at Eland the

plaintiffs did not offer them any nourishment or relief whatever. They were just turned out to live or die. Under such circumstances it is very doubtful if the plaintiffs are entitled to recover anything. The most they should be allowed is $500 damages for delay at Dickinson. The judgment should be accordingly reduced and modified.